UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | |
| | : | Chapter 13 |
| BRYAN T. MILLER, | : | |
| | : | Case No. 13-20559-AMC |
| DEBTOR | : | |
| | : | |
| BRYAN T. MILLER, | : | |
| | : | |
| PLAINTIFF | : | Adv. Proc. No. 14-361-AMC |
| | : | |
| V. | : | |
| | : | |
| CITIBANK, N.A. | : | |
| | : | |
| DEFENDANT | : | |

Ashely M. Chan, United States Bankruptcy Judge

**OPINION**

**I.     INTRODUCTION**

The Debtor in this adversary proceeding seeks to void the second mortgage against his principal residence as wholly unsecured under § 506(d) of the Bankruptcy Code. However, in order to prove this, the Debtor needed to demonstrate that the value of his residence was less than the amount of the first mortgage against his residence. The Debtor has failed to do so. As a result, the Court finds in favor of the defendant in this proceeding.

**II.     FACTS AND PROCEDURAL HISTORY**

**A.     Background**

The Debtor owns and resides in a 3,600 square foot house built in 1948 that is located at 4108 Bensalem Boulevard in Bensalem, Pennsylvania ("Property"). Am. Compl. ¶ 4 & Ex. A, at 1, ECF No. 11. On December 9, 2011, the Debtor executed a note and mortgage against his

- 1 -

Property in favor of Citibank, N.A. ("Citibank"), in the amount of $249,250 ("First Mortgage"). Claim 8-1 Ex. B, at 3–5, Bankr. No. 13-20559 (Bankr. E.D. Pa. Feb. 10, 2014). On April 5, 2013, Citibank assigned the First Mortgage to CitiMortgage, Inc. ("CitiMortgage"). *Id.* Ex. C, at 1–2. On October 9, 2013, the Debtor and CitiMortgage entered into a loan modification of the First Mortgage whereby the parties agreed, *inter alia*, that the amount due under the First Mortgage was $254,364.84, as of October 1, 2013. *Id.* Ex. D, at 1. The Debtor subsequently executed another note and mortgage against his Property in favor of Citibank in the amount of $200,000 ("Second Mortgage"). Am. Compl. ¶ 8; Answer ¶ 8, ECF No. 17.

On December 5, 2013, the Debtor filed a voluntary Chapter 13 bankruptcy petition. On the list of secured claims in Schedule D, the Debtor included his First Mortgage with CitiMortgage in the amount of $254,364 and his Second Mortgage with Citibank in the amount of $206,055. Voluntary Petition Schedule D, at 1, Bankr. No. 13-20559 (Bankr. E.D. Pa. Dec. 5, 2013), ECF No. 1. On February 10, 2014, CitiMortgage filed a secured proof of claim in the amount of $254,140.98 in connection with the First Mortgage. Claim 8-1, *supra*, at 1. Citibank did not file a proof of claim in connection with the Second Mortgage.

On August 18, 2014, the Debtor filed an adversary complaint ("Complaint") against Citibank seeking to void the Second Mortgage as wholly unsecured pursuant to § 506(d), based upon the Debtor's alleged lack of equity in the Property after application of the First Mortgage. Compl. ¶ 15, ECF No. 1. As evidence of the Debtor's lack of equity in the Property, the Debtor attached an appraisal of the Property dated September 16, 2013 ("Debtor's First Appraisal"), which listed the fair market value of the Property as $255,000 and referenced the amount of the First Mortgage as $254,140.97. *Id.* ¶¶ 10–11 & Ex. A, at 2.

On September 30, 2014, Citibank filed an answer to the Complaint and correctly observed that, even if the Debtor's First Appraisal was accurate, the Debtor could not void the Second Mortgage under § 506(d) because there still existed a de minimis equity cushion of $859.03 in the Property after the First Mortgage (i.e., $254,140.97) was deducted from the Property's alleged fair market value (i.e., $255,000). Resp. ¶ 15, ECF No. 5.

On January 4, 2015, however, a leak in the second floor bathroom caused "substantial water damage throughout" the Property ("Water Damage"). Am. Compl. Ex. A, at 1; Joint Pretrial Statement ¶ B.5, ECF No. 26. The Water Damage consisted of: exposed ceiling and drywall damage, flooring damage, and removed cabinets in the kitchen; exposed ceiling and drywall damage, and flooring damage in the basement; and flooring, sheetrock, and trim damage in the master bedroom and bath. Answer Ex. A, at 7.

On February 3, 2015, the Debtor filed an Amended Complaint against Citibank alleging that the fair market value of the Property had dropped from $255,000 to $245,000 based upon the Water Damage and attached an updated appraisal of the Property ("Debtor's Second Appraisal") dated January 23, 2015 ("Valuation Date"). Am. Compl. ¶ 10 & Ex. A, at 1–2. Based upon the drop in the Property's value, the Debtor again alleged that there was no equity in the Property after application of the First Mortgage and requested that the Court void the Second Mortgage as wholly unsecured pursuant to § 506(d). *Id.* ¶¶ 11, 15.

On June 4, 2015, Citibank filed an answer to the Amended Complaint and attached its own appraisal of the Property ("Citibank Appraisal"), which listed the fair market value of the Property, as of the Valuation Date, at $374,000. Answer Ex. A, at 8. The Citibank Appraisal also concluded that, after the Water Damage was repaired, the Property would be worth $404,000. *Id.*

Therefore, Citibank argued that, at all times, the Debtor retained equity in the Property after application of the First Mortgage such that the Second Mortgage could not be voided. *Id.* ¶ 15.

### B. The Trial

A trial was scheduled for June 2, 2016. In their Joint Pretrial Statement, the parties agreed that, based on their conflicting appraisals, "[t]he only fact in dispute is the value of the property in question." Joint Pretrial Statement ¶ C.1. The parties also agreed that the Second Mortgage could only be voided under § 506(d) if the Court determined that the fair market value of the Property was less than or equal to the amount of the First Mortgage, or $254,140.97.[1] *Id.* ¶ E.1.

#### 1. Debtor's Property

As mentioned above, the Property is located in Bensalem and was built in 1948. In 2009, the Property was "fully remodeled and expanded" and now has an upgraded exterior, flooring, kitchen, baths, heating and air-conditioning, and electrical components, as well as a finished basement and a "hair salon" that is used as a "home-based business." Am. Compl. Ex. A, at 2; Answer Ex. A, at 7. The Property is surrounded by other residential properties of various styles, as well as commercial and industrial properties, and is located on a busy, main road that experiences a high volume of traffic and noise. Answer Ex. A, at 7.

#### 2. Testimony of Debtor's Appraiser and Debtor

Henry Hoffman ("Mr. Hoffman") prepared the Debtor's Second Appraisal and testified that he has been an appraiser in the Philadelphia suburbs since 1978. Trial Tr. 5:4–8, ECF No. 31. In preparing the Debtor's Second Appraisal, Mr. Hoffman inspected the Property, searched public records for taxes and lot size, examined the market to find sales of similar properties and

---

[1] As explained below, if the Second Mortgage was even partially secured, it could not be voided under § 506(d) and the Debtor's requested relief would be denied. *See In re McDonald*, 205 F.3d 606, 609 (3d Cir. 2000) (stating that the antimodification clause of § 1322(b)(2) "applies to both the part of a mortgage that is currently secured by value in the residence and the part that is unsecured").

- 4 -

compared those sales and types of properties to the Property.[2] Am. Compl. Ex. A, at 4; Trial Tr. 7:14–21. Ultimately, Mr. Hoffman used the following three properties which he determined to be similar to the Property ("Debtor's Comparables"):

(1) 1700 Dixon Avenue in Croydon, Pennsylvania ("Dixon Avenue"), which sold for $247,000 on March 24, 2014;

(2) 2148 Andrea Drive in Bensalem, Pennsylvania ("Andrea Drive"), which sold for $265,000 on January 20, 2015; and

(3) 4751 Yates Road in Bensalem, Pennsylvania ("Yates Road"), which sold for $320,000 on February 14, 2014.

Am. Compl. Ex. A, at 2. Mr. Hoffman adjusted the sales price of each of the Debtor's Comparables to account for differences between the properties, such as location, lot size, room count, gross living area, and whether there was a finished basement, garage, fireplace and pool. *Id.* In addition, he deducted $25,000 from each of the Debtor's Comparables to account for the Water Damage to the Property. *Id.*

As a result of the foregoing, Mr. Hoffman concluded that each of the Debtor's Comparables were subject to the following net changes: (1) a total net decrease of $11,100 to Dixon Avenue which resulted in a value of $235,900; (2) a total net increase of $18,290 to Andrea Drive which resulted in a value of $283,290; and (3) a total net decrease of $75,000 to Yates Road which resulted in a value of $245,000. *Id.* Thus, the average sale price of the Debtor's Comparables, as adjusted by Mr. Hoffman, is approximately $254,730.

Mr. Hoffman testified at trial that all of the Debtor's Comparables were within two miles of the Property.[3] Trial Tr. 8:3–5. Although he acknowledged that the Debtor's Comparables were

---

[2] Mr. Hoffman's son, Jessie Hoffman, prepared the Debtor's First Appraisal. Trial Tr. 18:16–25.

[3] Dixon Avenue is 1.26 miles from the Property; Andrea Drive is 1.59 miles from the Property; and Yates Road is 0.73 miles from the Property. Am. Compl. Ex. A, at 2.

-5-

farther from the Property than was standard, he explained that he used them because they more closely matched the size and age of the Property, which was built more recently and is larger than most of the other properties in its immediate area. *Id.* at 8:6–10, 10:8–10. Mr. Hoffman also noted that the Debtor's Comparables were located on streets that were less busy than the one in front of the Property, but that they were also not in developments. *Id.* at 8:11–10:1. Finally, Mr. Hoffman testified that "the location of the property" is "the determining factor" and that the Property was in such a bad location that many buyers would not "even get out of the car" to look at the Property when they realized that the Property was located on a main street. *Id.* at 17:9–16.

Mr. Hoffman also testified that the Debtor's Comparables were "similar" in terms of age to the Property, which was sixty-seven years old.[4] *Id.* at 14:4–8. He testified that he would not use a "new construction" house as a comparable sale in determining the value of the Property. *Id.* at 14:9–12. Mr. Hoffman testified that the Debtor's Comparables were similar to the Property in terms of size.[5] *Id.* at 13:1–5. Finally, Mr. Hoffman testified that the lot sizes of Dixon Avenue and Andrea Drive were similar to the lot size of the Property, but that the lot size of Yates Road was larger than the Property's lot size.[6] *Id.* at 13:16, 14:25–15:2, 16:9.

On cross-examination, Mr. Hoffman acknowledged that the Property was located in the Bensalem school district while Dixon Avenue was located in the Bristol school district. He agreed that any difference in the quality of education between the two school districts would

---

[4] Dixon Avenue is ninety-four years old; Andrea Drive is thirty-eight years old; and Yates Road is thirty-one years old. Am. Compl. Ex. A, at 2.

[5] Dixon Avenue is 3,050 square feet; Andrea Drive is 2,884 square feet; and Yates Road is 3,591 square feet. Am. Compl. Ex. A, at 2.

[6] The Property's lot size is 15,000 square feet; Dixon Avenue's lot size is 13,068 square feet; Andrea Drive's lot size is 7,104 square feet; and Yates Road's lot size is 46,609 square feet. Am. Compl. Ex. A, at 2.

have a material impact on the value of the Property, but no evidence regarding the quality of either school district was presented by either the Debtor or Citibank. *Id.* at 19:7–20.

With regard to Andrea Drive, Citibank's counsel challenged the reliability of using the sale price of such property because Andrea Drive had been sold at foreclosure. Mr. Hoffman conceded on cross-examination that, if he had known that Andrea Drive was sold at a foreclosure sale rather than a "normal sale," it could have affected the value that Mr. Hoffman ultimately assigned to the Property. *Id.* at 19:21–20:2.

Finally, with regard to Yates Road, Citibank's counsel asked Mr. Hoffman whether Mr. Hoffman had taken into consideration the fact that the Property had "gorgeous" upgraded appliances while Yates Road still had its original appliances. Mr. Hoffman would not concede that such fact would have affected the value of the Property, but also admitted that he had not looked at the appliances in Yates Road. *Id.* at 20:16–21:10.

The Debtor briefly testified after Mr. Hoffman and confirmed that the street that the Property is located on, Bensalem Boulevard, is very busy. *Id.* at 28:11–29:17. He testified that he worries for the safety of his children whenever they are walking on the street or taking the bus. *Id.* at 28:13–15. On cross-examination, the Debtor admitted that he received approximately $78,000 from his insurance company to repair the Water Damage. *Id.* at 34:2–22.

### 3. Testimony of Citibank's Appraiser

Brett Freeman ("Mr. Freeman") prepared the Citibank Appraisal and testified that he has been an appraiser in the tri-state area for thirteen years. Trial Tr. 41:23–42:2. Like Mr. Hoffman, Mr. Freeman searched for properties that were in a "similar condition" to the Property assuming that the Property was "fully remedied and repaired." *Id.* at 46:15–20. He considered factors including "critical points, style, features, amenities, location, utilities, and appeal to a buyer in the marketplace." Answer Ex. A, at 8.

Ultimately, Mr. Freeman used the following five properties which he determined were similar to the Property ("Citibank's Comparables"):

(1) 900 Wayland Circle in Bensalem, Pennsylvania ("Wayland Circle"), which sold for $400,000 on April 15, 2014;

(2) 710 Farley Road in Bensalem, Pennsylvania ("Farley Road"), which sold for $420,000 on September 15, 2014;

(3) 908 Golls Garden Lane in Bensalem, Pennsylvania ("Golls Garden Lane"), which sold for $425,000 on April 24, 2014;

(4) 2699 Hulmeville Road in Bensalem, Pennsylvania ("Hulmeville Road"), which was listed for $325,000 as of the Valuation Date; and

(5) 2271 Lakewood Avenue in Bensalem, Pennsylvania ("Lakewood Avenue"), which was listed for $400,000 as of the Valuation Date.

Answer Ex. A, at 3–4. Mr. Freeman then adjusted the sales price of each of Citibank's Comparables to account for differences between the properties, such as location, lot size, room count, gross living area, and whether there was a finished basement, garage, and porch. *Id.*

As a result of the foregoing, Mr. Freeman concluded that each of Citibank's Comparables were subject to the following net changes: (1) a total net increase of $22,261 to Wayland Circle which resulted in a value of $422,261; (2) a total net increase of $5,406 to Farley Road which resulted in a value of $425,406; (3) a total net decrease of $21,900 to Golls Garden Lane which resulted in a value of $403,100; (4) a total net increase of $30,799 to Hulmeville Road which resulted in a value of $355,799; and (5) a total net increase of $2,358 to Lakewood Avenue which resulted in a value of $402,358. *Id.* Thus, the average sale price of Citibank's Comparables, as adjusted by Mr. Freeman, is approximately $401,784.

Ultimately, Mr. Freeman determined that the "as-repaired" value of the Property was $404,000. *Id.* Ex. A, at 8. In order to determine the value of the Property as of the Valuation Date, Mr. Freeman deducted an estimated "cost to remedy" the Water Damage equal to $30,000

from the "as-repaired" value. *Id.* As a result, he ultimately concluded that the Property was worth $374,000 as of the Valuation Date. *Id.*

At trial, Mr. Freeman testified that "[l]ocation impacts value" and observed that Dixon Avenue was not only "in a different municipality and school district" than the Property, it was separated from the Property by a major interstate highway. Trial Tr. 48:20–49:17. Mr. Freeman testified that these differences would have a material impact on the ultimate value of the Property. *Id.*

On cross examination, Mr. Freeman acknowledged that Wayland Circle, Farley Road, and Golls Garden Lane were all located in "superior location[s]" as compared to the Property because they were in low traffic, residential neighborhoods and not on main roads. *Id.* at 55:25–56:19. However, he also testified that Hulmeville Road was "located on a main, high-traffic road," just like the Property. *Id.* at 62:2–5. He therefore admitted that the streets on which Citibank's Comparables were located were generally dissimilar to Bensalem Boulevard, although they were located within the same municipality as the Property, unlike the Debtor's Comparables. *Id.* at 56:20–57:4. In fact, Citibank's Comparables were closer, on average, to the Property than the Debtor's Comparables were.[7]

With regard to age, Mr. Freeman testified that "in many instances age isn't so much a factor as condition." *Id.* at 57:9–11. Accordingly, he placed more emphasis on a property's "effective age, which is more consistent with [its] condition and improvements," than its physical age. *Id.* at 57:12–58:6, 60:17–22. Mr. Freeman therefore asserted that the Property could be accurately compared to Citibank's Comparables, despite their actual youth, because the

---

[7] Wayland Circle is 0.97 miles from the Property; Farley Road is 0.64 miles from the Property; Golls Garden Lane is 0.11 miles from the Property; Hulmeville Road is 1.44 miles from the Property; and Lakewood Avenue is 1.82 miles from the Property. Answer Ex. A, at 3–4.

Property was almost "completely renovated."[8] *Id.* at 59:3–25. Specifically, he testified that the Property had "upgraded Bruce hardwood floors, new drywall throughout" and, although the front of the Property was older, "the majority of the house was brand new or relatively new." *Id.* at 59:19–25. In addition, Mr. Freeman testified that "the overall condition" of a property is not necessarily contingent upon its need for certain repairs; in the Debtor's case, he accounted for the costs to repair the Water Damage by deducting $30,000 from the "as-repaired" value of the Property. *Id.* at 57:25–58:9.

Mr. Freeman also testified that Citibank's Comparables were similar to the Property in terms of size.[9] In addition, the lot sizes of most of Citibank's Comparables also were similar to the Property's lot size.[10]

Finally, Mr. Freeman acknowledged that Hulmeville Road and Lakewood Avenue were not actually sold; rather, the sale prices listed in Citibank's Appraisal for those properties were merely the listing prices pending as of the Valuation Date. *Id.* at 61:17–62:7. He included them in Citibank's Appraisal because: (1) they were more similar to the Property than the other properties listed in the Citibank Appraisal (i.e., Hulmeville Road was located on a high traffic road and Lakewood Avenue was "a new construction opportunity"); and (2) they were listed within the "prevailing market conditions" of the Valuation Date, and therefore were more reliable. *Id.* Mr. Freeman admitted that he does not know whether either property was ever

---

[8] Wayland Circle is nineteen years old; Farley Road is forty-seven years old; Golls Garden Lane is fifteen years old; Hulmeville Road is seven years old; and Lakewood Avenue is a new construction. Answer Ex. A, at 3–4.

[9] Wayland Circle is 3,084 square feet; Farley Road is 2,576 square feet; Golls Garden Lane is 3,374 square feet; the Hulmeville Road Sale is 3,919 square feet; and the Lakewood Avenue Sale is 2,900 square feet. Answer Ex. A, at 3–4.

[10] Wayland Circle's lot size is 16,988 square feet; Farley Road's lot size is 20,038 square feet; Golls Garden Lane's lot size is 12,197 square feet; Hulmeville Road's lot size is 13,068 square feet; and Lakewood Avenue's lot size is 9,148 square feet. Answer Ex. A, at 3–4.

actually sold. *Id.* at 63:10–12. However, Mr. Hoffman later testified that Lakewood Avenue, which was listed for $400,000 according to Citibank's Appraisal, was under contract for sale at $385,000 as of February 2015.[11] *Id.* at 66:3–15.

On redirect, Mr. Hoffman testified that, with respect to the properties listed in Citibank's Appraisal that had sold prior to the Valuation Date, the sale price for such properties was unreliable because the properties sold within "a matter of days" of being on the market and therefore were "highly marketable." *Id.* at 66:20–67:2. However, he previously had testified that, although the real estate market was struggling from 2007 to 2013, it was quickly improving beginning in 2014. *Id.* at 16:15–25.

After the trial, the parties each submitted proposed findings of fact and conclusions of law. Based upon the parties' appraisals, the testimony given at the trial, and the parties' proposed findings of fact and conclusions of law, the Court will now determine whether the Debtor may void the Second Mortgage as wholly unsecured pursuant to § 506(d).

## III. DISCUSSION

### A. Section 506(d) Lien Stripping

Section 506(a)(1) provides that an allowed claim of a creditor that is secured by a lien on a debtor's property "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). Thus, to the extent that the value of the collateral securing a creditor's claim is less than such

---

[11] Although Mr. Hoffman testified that his research suggested that Hulmeville Road was sold for only $250,000 (not $325,000), he later admitted that he might have been mistaken about that number when presented with contrary evidence that it was listed for $325,000. Trial Tr. 67:6–68:24.

- 11 -

creditor's claim, the creditor is deemed to be undersecured and the creditor's claim is bifurcated into an allowed secured claim and an allowed unsecured claim.

Section 506(d) states that, with certain exceptions not applicable here, "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void." *Id.* § 506(d). Accordingly, the portion of an undersecured creditor's lien which is based upon the creditor's bifurcated unsecured claim will be "stripped off" under § 506(d).

However, in the context of liens against a debtor's principal residence in a chapter 13 proceeding, the bifurcation of a secured creditor's claim under § 506(a) and the voiding, or "stripping off," of a lien to the extent of the unsecured portion of an undersecured creditor's claim under § 506(d), is trumped by § 1322(b)(2) which prohibits modification of a claim secured "only by a security interest in real property that is the debtor's principal residence." *Nobleman v. Am. Sav. Bank*, 508 U.S. 324, 325–26 (1993). In addition, the Third Circuit has clarified that "the anti-modification clause of § 1322(b)(2), as construed in *Nobleman*, applies **only** if a claim is at least partially secured." *In re Cusato*, 485 B.R. 824, 830–31 (Bankr. E.D. Pa. 2013) (emphasis in original) (citing *In re McDonald*, 205 F.3d 606, 611, 614 (3d Cir. 2000)).

Because the Property at issue here is the Debtor's principal residence, Citibank's Second Mortgage cannot be voided under § 506(d) if a portion of the Second Mortgage is at least partially secured by the Property. Thus, this Court must determine whether there is any equity in the Property after application of the First Mortgage which could secure Citibank's lien. If any equity exists in the Property after application of the First Mortgage, the Second Mortgage will be partially secured by the Property and the Debtor will not be able to void the Second Mortgage under § 506(d). If, however, no equity exists in the Property after the First Mortgage, the Debtor may void the Second Mortgage as wholly unsecured under § 506(d).

### B. The Value of the Property

In the context of a valuation under § 506(a), "the Debtor bears the burden of proof." *In re Hamilton*, Bankr. No. 12-19762, Adv. No. 13-002, 2013 WL 1819546, *3 (Bankr. E.D. Pa. Apr. 22, 2013) (citing *In re Henry*, 457 B.R. 402 (Bankr. E.D. Pa. 2011); *In re Finnegan*, 358 B.R. 644 (Bankr. M.D. Pa. 2006)). The Court will value the Property as of the Valuation Date which is the date used in both the Debtor's Second Appraisal and Citibank's Appraisal.[12]

Based upon the appraisals and the testimony of Mr. Hoffman, Mr. Freeman and the Debtor, it is clear that the Property was located on a busy street which would not be an ideal location for all buyers. On the other hand, recent renovations undertaken on the Property in 2009 certainly would enhance the attractiveness of the Property to buyers.

With regard to the appraisals, the size of the house and the lot size of most of the properties listed in the Debtor's Second Appraisal and Citibank's Appraisal were relatively similar to the Property. Also, both appraisers deducted almost the same amount to account for the repairs that needed to be performed on the Property as a result of the Water Damage ($25,000 by Mr. Hoffman and $30,000 by Mr. Freeman). However, most of the properties listed in the Debtor's Second Appraisal were farther from the Property than the properties listed in Citibank's Appraisal.

Where the appraisals and testimony clearly diverged, however, was the importance of the age of a property. The Debtor's appraiser focused solely on the actual age of a house while

---

[12] The Court notes that the date on which a property should be valued for the purposes of § 506(d) is at least uncertain. *See McDonald*, 205 F.3d at 615 (observing that "[t]here is no clear consensus" as to "what date a court should use to determine whether a mortgage is wholly unsecured"); 4 *Collier on Bankruptcy* ¶ 506.03[10] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) (observing that "courts disagree whether, for purposes of lien avoidance under section 506(d), value should be determined as of the time of the confirmation of a plan or as of the petition date"). Here, both the Debtor and Citibank agreed to use the Valuation Date, which occurred shortly after the Water Damage to the Property, as the date to measure the value of the Property. Accordingly, the Court will use the Valuation Date for the purpose of resolving this adversary proceeding.

Citibank's appraiser focused on both the actual age of a house as well as any recent renovations performed on the house, or the "effective age" of the house. The Court finds Citibank's appraiser to be the more credible witness on this issue because the physical age of a house is clearly affected by any renovations performed on the property. Looking at the physical age alone will not be determinative of the value that a buyer will ultimately pay; rather, the effective age of the property should be used and calculated by looking at both the actual age of a house and any recent renovations performed on the house.[13]

With respect to the specific criticisms of the properties used in each of the appraisals, the Court finds that the sale price of Andrea Drive should be given less weight because it was sold at a foreclosure sale and would likely have commanded a higher price if it were sold under ordinary circumstances. On the other hand, the list price of Hulmeville Road and Lakewood Avenue should also be given less weight since neither sale was completed as of the Valuation Date. Finally, Mr. Hoffman's criticism that the other properties used in Citibank's Appraisal cannot be compared to the Property makes no sense.

Based upon the foregoing, the Court finds that the first three properties listed in Citibank's Appraisal were more relevant to the determination of the Property's value than the properties listed in the Debtor's Second Appraisal. In addition, while the Court finds that it was appropriate for the Debtor to take into consideration the fact that the Property was located on a busy street, the Court also finds that the Debtor's appraiser failed to fully contemplate the added value of the renovations to the Property. Reducing Citibank's proposed valuation to account more fully for the location of the Property on a busy street, and increasing the Debtor's proposed

---

[13] In the Debtor's Second Appraisal, Mr. Hoffman concedes that the effective age of the Property is fifteen years. Am. Compl. Ex. A, at 1.

- 14 -

valuation to account more fully for improvements to the Property, the Court finds that the value of the Property is $325,000.

Since both parties agree that the amount of the First Mortgage is $254,140.97, the Court concludes that the Debtor retains equity in the Property, after application of the First Mortgage, equal to $70,859.03. Citibank's claim against the Property therefore is partially secured to the extent of such equity. Accordingly, Citibank's Second Mortgage is protected by the antimodification provision in § 1322(b)(2) and cannot be voided under § 506(d).

## IV. CONCLUSION

The Debtor has failed to demonstrate that Citibank's Second Mortgage is wholly unsecured and, therefore, is prohibited by § 1332(b)(2) from voiding the Second Mortgage under § 506(d). Therefore, the Court rules in favor of Citibank and against the Debtor in this adversary proceeding. An appropriate order follows.

Date: October 13, 2016

Honorable Ashely M. Chan
United States Bankruptcy Judge